LAFAYETTE STREET CHURCH SOCIETY OF BUFFALO v. NORTON.

(Supreme Court, Equity Term, Erie County. December, 1911.)

1. FRAUD (§ 27*)—CONCEALMENT OF FACTS.

Plaintiff, a church society, transferred real estate to defendant. Plaintiff's trustees understood that the conveyance was to be made for the mere purpose of placing the title in a third person in order that a lease of the premises for theatrical purposes might be made. Defendant and his brother, who was his law partner and who was a trustee of the church, and acted for it in the transaction, both understood that this was the purpose of the conveyance. The conveyance, prepared by defendant and his brother, was absolute in form, but it was understood by plaintiff's trustees that the grantee would hold the title for plaintiff's benefit. Defendant before the transfer had had negotiations with the proposed lessees, knew that by reason of certain alterations to the premises, which would be required, they would not take a lease unless it contained an option to purchase, and had agreed to give them an option at $52,000

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

more than the price to him, which he had secured by a mortgage of the property upon which he was not personally liable. These facts were concealed from plaintiff. Defendant subsequently sold the property to the lessees at the price named in the option. *Held*, that the action of defendant in concealing such information and in denying plaintiff's right to the profits realized on the sale of the property by him constituted a fraud which would have justified a reformation or rescission of the deed, and, the rights of an innocent grantee having intervened, plaintiff could recover the fruits of the fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 8; Dec. Dig. § 27.*]

2. FRAUD (§ 58*)—CONCEALMENT OF FACTS—EVIDENCE—WEIGHT AND SUFFICIENCY.

In an action by a grantor to recover profits of a sale by the grantee to whom title was transferred for the purpose of leasing the property, evidence *held* sufficient to show that the grantee knew, before he took the conveyance, that the lessees would not take a lease without an option to purchase, and that they were willing to purchase at a much higher figure than that at which the property was valued in the transaction between the grantor and grantee.

[Ed. Note.—For other cases, see Frauds, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

Action by the Lafayette Street Church Society of Buffalo against Herbert F. J. Norton to have certain moneys in the hands of defendant decreed to be the property of plaintiff. Judgment for plaintiff.

Clinton & Clinton, for plaintiff.
Shire & Jellinek, for defendant.

BROWN, J. Upon a former trial of this action it was determined by the trial court that the defendant took the title to the property of the plaintiff on Lafayette Square in the city of Buffalo as trustee for the plaintiff, and judgment was awarded the plaintiff for the amount of the profits realized by the defendant upon a sale by him in violation of his trust. The Court of Appeals in 202 N. Y. 379, 95 N. E. 819, upon an appeal from the judgment of the Appellate Division (134 App. Div. 994, 119 N. Y. Supp. 1132), unanimously affirming the judgment of the trial court, held that the conveyance by the plaintiff to the defendant, being in the nature of an absolute conveyance, could not be challenged and a trusteeship on the part of the defendant created by oral evidence of the plaintiff's trustees; that no trust had been established; and that the judgment must be reversed and a new trial had. Upon the new trial the testimony is the same as that offered on the former trial, with one minor addition. It is not now claimed that the defendant took the title as trustee, and, in view of the decision of the Court of Appeals, it is not seen how such claim could be made. The law must be deemed as settled that upon the proofs the defendant did not take title as trustee for the plaintiff. It is now claimed, however, that inasmuch as the plaintiff, through its trustees, understood that the conveyance was to be to the defendant for the purpose of leasing the premises for plaintiff's benefit, and inasmuch as the defendant gave the plaintiff to so understand, and inasmuch as the defendant knew at the time of the conveyance that

the proposed lessees would take an option to purchase at an advance of $52,000 over the consideration named in the deed to the defendant, and inasmuch as the defendant knew that the plaintiff's trustees would not have conveyed to the defendant had they known that such option was to be included in such lease, and inasmuch as the defendant concealed such knowledge of the option from the plaintiff's trustees, and inasmuch as the defendant, through his law partner, his brother, who was one of the plaintiff's trustees and acting for the plaintiff, prepared as the attorney for the plaintiff the necessary legal papers for such conveyance in such a manner that no trust was in law provided for, that the transaction from its beginning, resulting in an absolute conveyance to the defendant, was a fraud on the plaintiff, and that its damages, by reason of the fraud, is the amount realized by the defendant thereby, and that such amount, now in the hands of a trust company, paid under an order of the court, is the property of the plaintiff. It is claimed by the plaintiff that its rights, based upon such charge of fraud, have not been passed upon, and were in no manner involved in the decision heretofore rendered herein. The learned justice before whom the first trial was held stated in an opinion, in referring to a brother of the defendant, Mr. Nathaniel W. Norton, a trustee of plaintiff, who attended a meeting of plaintiff's trustees January 22, 1901:

"Inasmuch as he did not at that meeting inform the trustees that there was a prospect of obtaining a purchaser for the property, but, on the contrary, gave them to understand that the persons interested in the theatrical venture would not purchase the property but would lease it, I shall assume that he understood that, on account of his opposition to a sale of the property at $100,000, the defendant and Luther had abandoned their intention of purchasing the property, for otherwise there would be no escape from the conclusion that in concealing the plan formed by the defendant and Luther from his fellow trustees he was acting in bad faith and with a view to enable defendant to make a profit at the expense of the church of which he was a trustee. The learned counsel for the plaintiff presents and argues, with much plausibility, the further theory that, even though an absolute sale were not intended, material facts were concealed from the plaintiff's board of trustees under circumstances devolving a duty upon the defendant and Trustee Norton to disclose them, which if disclosed before the rights of a bona fide holder intervened would have justified a rescission, and now that such rights have intervened, call upon a court of equity to declare the defendant to be constructively a trustee for the plaintiff, and to require him to account to it for any profits realized by him. As I view the evidence, the plaintiff did not intend to sell to the defendant, but intended only to convey to him the legal title in trust, and he is chargeable with knowledge that such was the intention of the majority at least of the trustees, and I therefore do not deem it necessary to consider or to decide the merits of the other theory which would involve a finding of bad faith, not only on the part of the defendant, but on the part of others."

It is thus seen that the questions now presented for consideration have not been heretofore considered or decided.

The plaintiff's complaint, after alleging that Nathaniel W. Norton was authorized to prepare papers for a sale to some person at a minimum price of $120,000 for the purpose of having the property leased for $4,000 a year, and that Nathaniel W. Norton inserted the name of the defendant in the conveyance, alleges that, unknown to plain-

tiff's trustees, negotiations had been pending for some time prior to the conveyance for an option permitting the proposed lessees to purchase the property for $172,000; that the defendant and Nathaniel W. Norton, in violation of the rights of and their duty to the plaintiff, and with the intent to deceive and defraud the plaintiff, concealed and kept from the knowledge of the plaintiff and its trustees the proposal to purchase for $172,000; that the plaintiff and its trustees relied on the good faith of the Nortons; and that they would not have conveyed said property had they known or suspected that negotiations were pending with said proposed lessees for a lease containing an option to purchase at $172,000.

[1] It conclusively appears from the evidence that plaintiff's trustees understood that the conveyance was to be made for the mere purpose of placing the title in a third person, to the end that a lease of the premises might be made for theatrical purposes, that Nathaniel W. Norton and defendant both understood that such was the purpose of the conveyance; that, while the conveyance was made absolute in form, it was not so understood by the plaintiff's trustees, and it was believed by them that the title thereby conveyed would be held by the person selected by Nathaniel W. Norton as grantee for the plaintiff's benefit; that Nathaniel W. Norton was acting for the plaintiff and its trustees as their attorney; that his relations with the defendant were of a close, confidential nature; that it was the duty of Nathaniel W. Norton to fully advise the plaintiff and its trustees of all matters within his knowledge affecting their interests; that it was the duty of Nathaniel W. Norton to obtain for the plaintiff all financial advantages known by him to be available at the time of proposing the placing of the title in his brother, the defendant, for any purpose; that it was the duty of the defendant in taking the title through negotiations with Nathaniel W. Norton to give the plaintiff all the benefits he would be likely to receive through such title, based upon information known by him to have been concealed from the plaintiff.

[2] The sole question, therefore, seems to be whether the defendant had any knowledge on the 26th day of January, 1901, at the time he accepted the deed from the plaintiff upon terms that involved no liability on his part to pay any part of the main consideration therein of $120,000; that the proposed lessees would be likely to insist upon an option to purchase the property at $172,000. If the defendant did have such knowledge, his taking the title under the circumstances, concealing such information and denying all right to the plaintiff to the profits thereby realized, amounts to a fraud, and would afford ample ground for a reformation or rescission of the deed. The defendant having conveyed to a bona fide purchaser, the title cannot be impeached, but the fruits of the fraud, now in the hands of the defendant, can be reached. It thus becomes very important to know when it was that negotiations for an option were opened. The only inference to be drawn from the testimony as to the time when the proposed lessees insisted upon an option being given them to purchase the property is that the lessees first understood that the improvements simply involved putting a gallery and a stage in the building, an ex-

penditure of about $15,000; that later the proposed lessees learned that an alley along the north side of the theater leading to Washington street must be provided, and that the building must be constructed of fireproof material, which would make the cost in the neighborhood of $50,000; that then the provision for an option to purchase at $172,000 was agreed upon.    All the witnesses agree that as soon as it was known that the improvements were to consist of the use of fireproof material, the building of the alley, etc., placing the cost of the improvements at two or three times the amount originally contemplated, then all negotiations between the proposed lessees and the Nortons involved the giving of an option to purchase.    The testimony of Rife, Kernan, and Knapp is filled with positive statements that, when it was known that the improvements were to cost $40,000 or more, then began talk, suggestions, and negotiations for an option.    It is an irresistible conclusion that it was the increased cost of the improvements that made the option a necessary part of the transactions between the Nortons and the theater people.    Rife testifies, in answer to the question as to when he learned the cost of the improvements:

"I cannot give you the time.    That was when Mr. Caulkins, the architect, filed his plans with the building department; and then they wanted an alley out through in the rear, and we had to use certain fireproof materials. * * * The acquiring of that information was what brought up to our minds the matter of getting an option to purchase."

Nathaniel W. Norton testifies upon the subject as to when the option was agreed upon by saying:    That on the 28th day of January, 1901, a lease was prepared in the morning.    That the proposed lessees left the office to see their architect and returned to the office about half past 4 or 5 in the afternoon, Mr. Luther, Mr. Kernan, Mr. Rife, Mr. Knapp, and Mr. Bagg.    "Mr. Kernan said that they had been to the architect's office, and they found the cost of the improvements to be much in excess of what they had expected.    Instead of its costing $15,000 as we originally contemplated, it had gone beyond that.    That it would be $30,000, and perhaps in excess of that.    Mr. Knapp said that with so much money put into these improvements he could not advise his client to enter into the lease without an option to purchase the property, and wanted to know if an option could be had on the property, and I think Herbert Norton and Mr. Knapp and myself went into one of the other offices out of mine and talked the matter down, and my brother said he would give them an option to purchase at $172,000.    He said go ahead and draw the lease with certain changes, and so the lease was redrafted."

If this testimony means anything at all, it means that from the time it was known that the proposed lessees would be called upon to expend $30,000 or $40,000 or more thousand dollars to convert the old church edifice into a suitable theater, they insisted to everybody that, if they made a lease and expended such sum in improvements, the lease must contain a provision that the lessees might purchase the property.    There is not the suggestion of any conference or meeting between the Nortons and any of the proposed lessees or of their attorneys after it was learned that an alleyway was to be provided and

fireproof material used, involving the increased expenditure, at which the option provision was not talked over and discussed. Much testimony is in the case from which it is claimed by defendant that this increased cost was not known of, and that the necessity for an option did not actually exist until January 28, 1901, just prior to the execution of the lease by Herbert F. Norton to Kernan and his associates two days after the execution of the deed by plaintiff to defendant; and the argument is strenuously urged that the defendant could not have had in mind the possibility of an option for a sale at $172,000 at the time he received his deed. Such testimony, if reliable, would go a long way toward exculpating the defendant from the charge against him, and I should readily adopt it as a sufficient answer to the imputation of fraud were it not for the fact that Nathaniel W. Norton had positive knowledge of such increased proposed expenditures on the part of the proposed lessees as early as the 22d day of January, 1901. On that day he submitted to the trustees of the plaintiff the proposition of the proposed lessees, stating to them, as appears by his personal, written record of the proceedings of that meeting:

"The lessees propose to make certain improvements upon the property, lowering the floor to the present level of the sidewalk, making the building fireproof, and making a passageway eight feet in width along the northerly line of the property out of Washington street, in fact, making the building over so as to be modern and fireproof; the proposition being to expend thirty or forty thousand dollars in improvements. And, further, the parties are especially anxious that the matter be arranged at once."

After reading the testimony of Nathaniel W. Norton, above quoted, giving the 28th of January as the time when the proposed lessees learned of the increased cost of improvements through their interview with their architect on that day, the very pertinent inquiry arises, How was it that Mr. Norton knew of such proposed expenditures on the 22d of January? If it be true that Mr. Kernan stated to Mr. Norton on the 28th that he that day had been to the office of the architect, and found that the cost of the improvements would be much in excess of what they had expected, that instead of costing $15,000, as was originally contemplated, it had gone beyond that—that it would be $30,000 or $40,000 or more—how was it possible for it to be true that at some time prior to the meeting of the trustees of the plaintiff on the 22d the lessees had proposed to expend $30,000 or $40,000 in making the improvements? According to the testimony of Mr. Kernan, his first interview with Nathaniel W. Norton as to the increased cost being $30,000 or $40,000 was shortly before the lease was signed. Mr. Norton stated to the trustees on the 22d of January that, "after various negotiations with some out of town parties, James L. Kernan and others," the proposition to lease and make extensive improvements had been made. Mr. Kernan says that, after it was learned that the improvements would cost a great deal more than he was originally told they would cost, he came to Buffalo; that, when he learned how much more they would cost, his attorney, Mr. Knapp, then suggested a provision that he have an option to purchase, which was embodied in the lease of January 28, 1901; that

it was then that Mr. Knapp insisted on an option, after it had been learned that it would cost a great deal more than was originally stated; that it was then first suggested that the lease should contain an option, when he was told that it would cost a great deal more than was originally stated.  If it be true that upon learning that the improvements would cost a great deal more than originally understood the option was then insisted upon, and it be true that Nathaniel W. Norton knew on the 22d of January that the lessees proposed to expend $30,000 or $40,000 or more in making improvements that originally had been understood would cost only about $15,000, then it is absolutely true that Nathaniel W. Norton knew on the 22d that the proposition of the lessees to expend $30,000 or $40,000 also included in it a provision that, if they took the property under a lease, the lease must contain an option to purchase.  It is impossible to read the testimony in this case without reaching the conclusion that Nathaniel W. Norton and the defendant both knew on the 22d day of January that the proposition that Nathaniel W. Norton stated to the trustees of the plaintiff as having been made by the proposed lessees contained in it an option to purchase.  The fact that at the very first recorded interview, at which the option price was mentioned, the sum of $172,-000 was named, is a very strong circumstance leading to the conclusion that at all interviews concerning the option itself the option price was understood by all to be that sum or that that price had been agreed upon at some previous interview, which for some reason does not appear to have been given by any witness.  It is unbelieveable that an option was for the first time insisted upon when it was learned that the cost of improvements would be $30,000 or $40,000 or more without something more being said as to the option price than appears from the evidence of the defendant.  As bearing upon the time when the Nortons and their associate, Luther, first suggested a purchase of the church property by the theater people, it is intimated by Rife, the agent of Kernan, who came to Buffalo from Baltimore in December, 1900, that the talk of a purchase may have been in December.  Remembering that Luther was seeking to secure control of the church property through the Nortons for the purpose of making a theater of it, it is quite significant that from the testimony of Luther and Rife it is very apparent that there had been some talk between Luther and the theater people about a sale to the theater people prior to January 22, 1901.  Remembering that it had been arranged between the defendant and William M. Luther that Luther was to have one-half interest in any rights that the defendant could obtain to the church property, it is interesting to know that Luther testifies:

"Q. Can you state, Mr. Luther, when it was that an option was first spoken of by the theater company?  A. I think it was the time that the papers were drawn that the lease was executed.  That is as I recall it.  It has been a long time.  These things were talked over a good many times before they were put on paper.  Mr. Herbert Norton did nothing with this property, making a lease or otherwise, before advising and counseling with me in reference to it.

The defendant asks the court to believe that there was but one talk about the option, and that on the 28th of January, 1901, at the very time and occasion when it was inserted in the lease two days after his deed from the plaintiff. It is too improbable for credence that the defendant could take by purchase in good faith the church property at a consideration of $120,000 on the 26th day of January, and on the 28th day of January give an option to purchase the property to the theater people at $172,000 without having had some talk with his partner, Luther, about such option prior to the actual giving of the option on the 28th. Such improbability is decisively corroborated by the testimony of Luther that "those things [the option] were talked over a good many times before they were put on paper." Luther also states that while the negotiations were going on, the meetings of the plaintiff's trustees held prior to the close of the transaction on the 26th of January, he saw the defendant very frequently—about every day. As a matter of fact the option was put on paper on January 28th. If it be true that it was talked over by Luther and the defendant a good many times before the 28th of January, the conclusion is irresistible that the defendant on the 26th at the time he took plaintiff's deed had in mind a likelihood of an option to the theater people.

It must be remembered that the relations between the defendant, Nathaniel W. Norton, and William M. Luther, as well as those between those men and the lessees, were during the negotiations that finally resulted in the lease and option of a very confidential nature. As has been so often said:

"No court is equal to the examination and development of all the truth in a great proportion of cases where these confidential relations exist."

But sufficient facts appear from the testimony to satisfy the impartial mind that Nathaniel W. Norton and the defendant had positive knowledge prior to January 26, 1901, that a lease requiring the lessees to expend $30,000 or $40,000 upon the property in its improvement could not be made unless it contained an option to purchase at $172,000. That it was the plan to conceal such information from the plaintiff's trustees is clearly apparent, and, in the language of Mr. Justice Laughlin, there is "no escape from the conclusion that in concealing the plan formed by the defendant and Luther from his (Nathaniel W. Norton's) fellow trustees he was acting in bad faith and with a view to enable the defendant to make a profit at the expense of the church of which he was a trustee."

The plaintiff is entitled to a judgment decreeing it to be the owner of the $26,000 now on deposit with the trust company and of the interest heretofore received by the defendant thereon.

Judgment is accordingly ordered, with costs. Let findings be prepared.